IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

             Plaintiff-Respondent,

  vs.                                    CIVIL NO. 08-409 JP/LFG
                                           CRIM. NO. 04-2147 JP

JOHN SAUNDERS,

             Defendant-Movant.

## <u>MAGISTRATE JUDGE'S FINDINGS OF FACT<br>AND RECOMMENDED DISPOSITION[1]</u>

### <u>Findings</u>

1.  This is a proceeding on a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, filed April 22, 2008 by Movant-Defendant John Saunders ("Saunders").  As grounds for his Motion, Saunders alleges that he received ineffective assistance of counsel at trial. in <u>United States v. Saunders</u>, No. CR 04-2147 JP.  The Government filed Responses [Docs. 9, 11], contending that Saunders received a fair trial and that his Sixth Amendment right to effective assistance of counsel was not violated.  Saunders filed a reply and a sur-reply [Docs. 10, 15].

### *Procedural Background*

2.  On October 3, 2008, the undersigned Magistrate Judge entered Findings and Recommended Disposition [Doc. 18] on the § 2255 petition, recommending that the Saunders's claims of ineffective assistance of counsel in failing to investigate and properly cross examine witnesses be dismissed with prejudice, but that the claim that counsel was ineffective in allegedly

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

advising Saunders to testify at trial presented a factual dispute that should be explored further at an evidentiary hearing.  Saunders contends that his attorney pressured him to take the stand and testify in his own defense, against his wishes, whereas counsel contends that Saunders insisted on testifying, against counsel's advice.

3.   No objections to the proposed findings were filed.  On October 31, 2008, Senior United States District Judge James A. Parker entered an Order [Doc. 19] adopting the recommendations, dismissing one claim and granting the request for an evidentiary hearing, to be limited to the claim of ineffective assistance of counsel in allegedly advising Saunders to testify at trial.

4.   After Saunders notified the Court that he had secured the services of counsel, the Court scheduled an evidentiary hearing to resolve the factual dispute. The hearing was held on March 23, 2009.  Saunders was represented at the hearing by Matthew M. Robinson of Covington, Kentucky. Mr. Robinson complied with D.N.M.LR-Civ. 83.8 by associating with local counsel; however, local counsel could not be present at the hearing due to a health emergency.  Present for the Government were Assistant United States Attorneys Charlyn E. Rees and Bill Pflugrath.

5.   On April 13, 2009, Saunders and the government filed proposed findings of fact and conclusions of law [Docs. 40, 41.]

*Testimony at the Evidentiary Hearing*

6.   Saunders testified that he was represented at trial by Assistant Federal Public Defender Roger Finzel ("Finzel").  Saunders was charged with the offense of bank robbery, and he had prior convictions for the same offense, of which Finzel was aware.  Saunders testified that Finzel told him there was "no other way" than for Saunders to take the stand at trial, that it would be "dangerous" for him if he did not testify – indeed, he would be "hanging himself" if he failed to tell the jury his story – and that the prior bank robbery convictions would be revealed to the jury in any event, whether he testified or not.

7.   Saunders further stated that Finzel did not adequately prepare him to testify.  He said that Finzel met with him only about three times.  On one of these occasions, he said, Finzel only asked

him two questions and spent the rest of the time describing trial procedures.  On another occasion, Saunders said, Finzel told him to "Shut your mouth – I'm not here to talk about your case."

8.  Saunders also stated that at one point prior to trial, Finzel brought him a document which he said was a waiver of his right not to testify, and told Saunders to sign it.  Saunders said that Finzel would not let him read the document and when he asked Finzel to read it to him, Finzel responded that he didn't have time.  Saunders acknowledged that he signed the waiver.

9.  On cross-examination, Saunders acknowledged that he participated in his defense but said he did not make any decisions about it, other than some suggestions about cross-examination.[2]  Saunders also said that he discussed some evidence with counsel, but that Finzel did not show him all of the evidence in the case.  Saunders acknowledged that he was not forced to go to trial; rather, it was his decision to do so.  Saunders agreed that he stated, under oath at trial, that he wanted to testify since "it was my butt on the line."  He acknowledged that this earlier trial testimony was untrue;  he said that in fact he did not want to testify, but was forced to do so by Finzel.

10.  Saunders said he wasn't aware that Finzel told his family it would be a horrible idea if he testified.  He said he didn't know, until after the trial, that his family felt he shouldn't testify.

11.  Saunders further said that, although he was aware of his right against self-incrimination and knew he had a right not to testify, nevertheless he felt forced to do so because Finzel told him he'd be "hanging himself" if he didn't and that only guilty people refuse to take the stand.  He said he relied on his attorney 100%.

12.  Saunders was asked on cross-examination about his prior conviction for a drug offense.  Saunders did not immediately admit that he had such a conviction, stating "it was aspirin," not Ecstasy.  However, when asked whether he pled guilty to the drug charge, he said, "Yes."

---

[2]Earlier, Saunders testified that Finzel was inclined to pass over cross-examination during the trial.  Saunders said that the only suggestions he made about his defense involved asking Finzel to cross-examine certain witnesses.  The Court notes that every witness called by the Government at trial was cross-examined by Finzel.

13.   Wrenn Saunders, Saunders's mother, was the next witness.  She testified that she discussed the case with Finzel, who told her he would not put Saunders on the stand at trial because that would open the door to evidence of the prior bank robbery convictions.  She said she was in agreement with Finzel that it would be a bad idea for her son to testify; however, she did not discuss this with her son prior to trial, because she thought Finzel would do so.

14.   Wrenn Saunders further testified that she was not present when her son met with Finzel. Asked on cross-examination whether it was possible that her son could have decided on his own, and against counsel's advice, that he should testify, she said she didn't know.

15.   Finzel also testified at the hearing.  Prior to the hearing, the government filed a motion for a ruling that Saunders waived his attorney-client privilege by filing a § 2255 petition alleging ineffective assistance of counsel.  The government noted in that motion that Finzel requested the ruling, as he would be more comfortable testifying about conversations with his client and releasing otherwise confidential information, if there were a formal determination that the attorney-client privilege had been waived. [Doc. 26].  The Court granted the motion [Doc. 27] and noted at the hearing that the attorney-client privilege was not applicable under these circumstances.  At the hearing, Finzel said that he requested the U.S. Attorney's office to obtain a written waiver and that he also asked to be subpoenaed for his testimony at the hearing.

16.   Finzel testified that he has been an Assistant Federal Public Defender ("FPD") for nearly 17 years and practiced law prior to joining the office of the FPD.  He was admitted to the bars of three jurisdictions and has participated in extensive continuing legal education in the areas of criminal defense and sentencing.  He stated he is aware of the ethical rules regarding representation of defendants in criminal cases and that he regularly reviews the ethics rules.

17.   Finzel stated that his responsibility as defense counsel is to protect the client's interests, to maintain client confidentiality, and to provide thorough and competent representation.  He said that he has worked as a defense attorney on hundreds of cases and has served as counsel in well over 100

criminal trials.  He testified further that he has never been the subject of complaints of ineffective assistance and that no bar association or court has ever found that he provided ineffective assistance.

18.  Finzel went on to say that, in every case there are two decisions that the defendant must make: whether to go to trial, and whether to testify.  He said that he always discusses these two issues with every client, usually at their first meeting.  It is a very rare case, he said, when he advises a client to testify, because any thing, however small, that a jury doesn't like about the testimony – even if it has nothing to do with the facts of the case – can easily lead to a conviction.

19.  Finzel directly contradicted Saunders's testimony that he forced Saunders to testify.  He denied that he ever told Saunders that he would be "hanging himself" if he failed to take the stand.  Finzel said that it was Saunders's idea to testify and that Saunders made that decision continuously throughout preparation for the case.  Saunders's stated reason for wanting to take the stand was because he felt it was important for the jurors to understand that when he'd had problems in the past, he admitted his guilt, whereas this time he was not guilty and thus wanted to proclaim his innocence.

20.  According to Finzel, he counseled Saunders against testifying for several reasons.  They included the fact that Saunders did not come across well as a witness, in that he gave various accounts of the same events; furthermore; he looked like and walked like the person on videotape whom the government claimed was Saunders, and Finzel was concerned that if the jury saw him get up and walk to the witness stand, they would likely agree with the government's identification of the person in the videotape, as Saunders' gait is distinctive and matched that of the person walking into and out of the storage locker.[3]

21.  Finzel stated that he asked for a halt in the trial proceedings just before Saunders took the stand, at the point where Saunders had to make the final decision whether to testify.   Finzel said that he then spoke to Saunders privately, telling him that the trial seemed to be going well up to that point

---

[3]The government relied in part on video surveillance evidence taken of Saunders' storage locker.  The trial evidence showed a man on the videotape who arrived at the storage unit in a white van, changed clothes in the unit, rode off on a motorcycle, returned shortly thereafter to the storage unit, went inside again, changed clothes and drove off in the white van.

and that he did not think that Saunders's testimony would aid his defense.  He said that, in spite of this advice, Saunders repeated that he wanted to testify.

22.   Finzel said that when he has a client who insists on testifying against his advice, he prepares a form for the client's signature in which the client acknowledges that the advice against testifying was given and rejected by the client.  Finzel said that he does this because he wants to emphasize the dangers of testifying and to show that he is serious about the advice.  Finzel prepared such a form in this case and brought it to Saunders at the jail.  When asked if he allowed Saunders to read the waiver before it was signed, he testified that "of course" he allowed Saunders to read the form before having him sign it.

23.   Simply telling a defendant that he shouldn't testify does not end things, Finzel said.  If the client nevertheless continues to insist on testifying, Finzel said he will do everything possible to prepare the client for his testimony even if, as counsel, he doesn't believe it's a good idea for the client to testify.  Finzel directly contradicted Saunders's testimony as to the extent of preparation for his testimony.

24.   Finzel stated that, in preparation for the testimony, he discussed with Saunders the more positive ways in which the prior convictions could be brought out.  Finzel did not remember exactly how many times they met, but he went over the events of the case with Saunders approximately six times, in sessions ranging from 10 to 45 minutes each.  Finzel said that he and his investigator asked Saunders questions about his actions, and challenged him with the questions they thought the government would ask.  Finzel said that he felt he was able to spend ample time with Saunders to prepare him for direct and cross examination.

25.   At one point, due to Finzel's concerns about the risk of Defendant testifying against counsel's advice, Finzel said he brought a colleague, Assistant FPD Tom Jameson ("Jameson"), into the case.  He said he wanted Jameson to provide an independent assessment for Saunders, to emphasize the dangers of testifying and to help prepare Saunders if he continued to insist on taking the stand.

6

26.  On cross-examination, Finzel was asked about the affidavit he signed which the government included with its response to the § 2255 Motion.  Saunders's attorney asked Finzel about his statement in the affidavit that he discussed the "positives" and "negatives" about Saunders's taking the stand in his own defense.  Finzel stated that by "positives," he meant that  if Saunders was going to testify in spite of counsel's advice, they had to try to make the testimony work in favor of the defense; for example, Saunders should bring up his prior convictions on direct examination before the government had a chance to "beat him over the head" with that evidence on cross-examination.

27.  Finzel was also asked why he did not include in the affidavit his concern, expressed in the evidentiary hearing, about Saunders standing up and walking to the witness stand, thus increasing the possibility that the jury could identify him as the person in the videotape.  Finzel responded that he wrote the affidavit in a "terse" manner and limited his response, not mentioning every detail or every conversation between himself and Saunders, because of  attorney-client privilege.  That was one reason, he said, why he asked the U.S. Attorney's office to secure a ruling on waiver of attorney-client privilege before he testified at the hearing.

28.  Jameson was called as a witness.  He testified that he had been with the FPD for almost 16 years.  He said that Finzel was concerned about Saunders's insistence on testifying and asked Jameson to speak to Saunders about his decision and, if Saunders continued to insist on testifying, to help him prepare to testify.

29.  Jameson stated that he met with Saunders one time.  At that meeting, he said he, too, advised Saunders that there was great danger in his testifying because of the high probability that the prior convictions would be revealed to the jury.  Jameson said that he discussed the risks of testifying, at length, but that Saunders very much wanted to testify.

30.  Once it was clear that Saunders would insist on testifying, Jameson said, he told Saunders that they'd better prepare for the testimony.  To that end, Jameson said, they practiced Saunders's testimony, focusing on the effect the testimony would have on the jury, avoiding emotional responses on cross-examination, and controlling the responses so as to present a reasonable demeanor.

31.  In their discussion, Jameson said, Saunders "vociferously" expressed his innocence and told Jameson he felt the jury would find very powerful the contrast between his admission of guilt when he was guilty in the past, and his taking the stand to deny guilt in this case.  Jameson said that this proposed tactic was not raised by defense counsel; rather, it was Saunders's idea and it was Saunders's desire to bring out this contrast for the jury.

32.  Jameson said that Saunders never stated to him that he did not want to testify but was being forced to do so by Finzel.  Jameson said that he himself advised Saunders that the risk in testifying was very high and he discouraged Saunders from testifying because of his prior convictions.  Jameson said that the probability of the prior convictions coming in would be much lower if Saunders did not testify.

*Credibility Findings*

33.  After hearing the testimony at the March 23 hearing, weighing the credibility of the witnesses and considering the parties's proposed Findings of Fact and Conclusion of Law, the Court finds that Saunders has failed to overcome the presumption that counsel's representation was constitutionally effective.  The Court resolves the factual dispute in favor of the Government and recommends that Saunders's § 2255 Motion be denied.

34.  The Court finds incredible Saunders's statement that he was forced against his will to testify at trial, and his statement that counsel forced him to sign the waiver of his right not to testify without permitting him to read it first.

35.  Attorney Finzel is a highly-regarded, senior trial lawyer with decades of experience representing defendants in criminal proceedings.  He testified that in all that time, his representation of criminal defendants has never been found to be constitutionally ineffective by any court or bar association, and there is nothing on the record to contradict this assertion.  Finzel testified that it is a rare case in which he would advise a client, particularly one with prior convictions, to testify in his own defense, and this was not that "rare case."  The Court has not been presented with anything to indicate that this was a special case which would prompt Finzel, a skilled and competent criminal

8

defense attorney, to go against that general rule.  Finzel did not recommend that Saunders testify.
Indeed, he counseled against it.  When Saunders rejected Finzel's good counsel, Finzel sought to
prepare Saunders to testify.

36.   Saunders does not claim that Finzel came up with the notion that the jury would be
impressed by his willingness to admit guilt when he was guilty and to testify at trial when he was not,
and Jameson confirmed that this notion was raised by Saunders, not by counsel.

37.   Finzel said that the practice sessions with Saunders led him to the conclusion that
Saunders would be a poor witness in his own defense.  His fear was confirmed when Saunders took
the stand at trial and began to answer questions in such a rambling narrative fashion that the trial
judge warned counsel to control the witness and ultimately ordered counsel to conduct direct
examination with leading questions.  The trial transcript shows that, at a bench conference on the
problem of Saunders's narrative responses, Finzel told the trial judge that Saunders was simply trying
to tell the jury his side of the story, although he couldn't say Saunders was doing so with the advice
of counsel.

38.  This Court observed Saunders on the stand at the evidentiary hearing on his motion and
finds credible Finzel's assertions that Saunders is not a good or credible witness and that he would
not help his case by testifying at trial.  At one point during the evidentiary hearing, the Court
admonished Saunders against the use of vulgar and inappropriate language on the stand.  In addition,
at the evidentiary hearing, Saunders often did not answer questions directly but attempted to provide
rambling explanations that were not responsive to the questions.  For example, he complained about
counsel's conduct of cross-examination at trial, an issue already resolved by the Court and not
relevant to the factual dispute over counsel's advice about testifying.

39.  The Court was particularly struck by Saunders's answer when the government asked him
whether he had a prior conviction for a drug offense.  Although he eventually admitted that he pled

guilty to that offense, his initial response was to say, "no, it was aspirin," not Ecstasy.[4]  Saunders did not seem to grasp the fact that the evidentiary hearing in this § 2255 matter was not convened to re-try an old case and that he would not enhance his credibility by glossing over the facts and trying to exonerate himself, rather than by directly answering a simple question.

40.   The Court also finds credible Finzel's testimony that "of course" he allowed his client to read the waiver which he prepared.  Indeed, it is almost inconceivable that any attorney would ask a client to sign a document without ensuring the client has read and understood the document; such behavior could be grounds for discharge or even disbarment.  Moreover, it simply is not believable that Saunders would have signed the document after asking to read it and being refused.  Saunders did not complain to the Trial Court about this alleged unconscionable behavior on the part of his attorney and, as the government pointed out, Saunders was not shy about sending letters to the trial judge when he was unhappy about other aspects of the proceedings.

41.   The Court finds that Jameson, also a skilled and experienced attorney, met with Saunders at Finzel's request because Saunders was insisting on testifying against Finzel's advise.  After Jameson pointed out the risks of that decision, he worked with Saunders to best prepare him for his testimony.  Jameson's testimony is entirely credible.  Saunders' testimony is not.

42.   Saunders's prior convictions are considerations relevant to the credibility determination. Fed. R. Evid. 609.  In addition, Saunders admitted at the hearing that he lied under oath when he

---

[4]Saunders' testimony was:
12 Okay. You also have prior convictions for drug
13 charges, don't you?
14 A. No. I mean yes, they arrested me for that, but it was
15 aspirin.
16 THE COURT REPORTER: It was what?
17 THE WITNESS: It was aspirin.
18 A. They arrested me for attempt to sell Ecstasy, but it
19 was aspirin. It wasn't Ecstasy.
20 Q. Mr. Saunders, I don't want to know the details. I just
21 want to know: Were you convicted of that charge?
22 A. Yes.
23 Q. Did you plead guilty?
24 A. Yes.
[Doc. 39, p. 20, lines 12-24.]

stated at trial that he was testifying voluntarily. When a witness admits that information he previously provided under oath was untruthful, this is an objective factor undermining the witness's credibility and supports a finding of fact that the witness's current testimony is not believable. United States v. Christian, 193 Fed. Appx. 800, 804 (10th Cir. 2006).

43. In sum, the Court finds credible Finzel's and Jameson's testimony and incredible Saunders' testimony. Finzel's version of the facts is more logical, and it is confirmed by the Jameson testimony. Saunders simply has not presented convincing evidence to explain why Finzel, a highly skilled and experienced criminal defense attorney, would have forced Saunders to testify against his will, especially when doing so would have violated Finzel's standard practice. Indeed, the very proposition defies logic. The credible testimony is that Finzel and his colleague Jamison counseled Saunders not to testify, but when it was apparent that Saunders rejected this advice, Finzel and Jameson did what ethical, competent attorneys would have done, that is, they assisted Saunders in preparing his testimony so as to put the proposed testimony in the most favorable light. Even with that preparation, Saunders performed poorly as a trial witness.

44. A § 2255 petitioner alleging ineffective assistance must make a two-pronged showing: he must demonstrate both that counsel's performance was defective, and that the defective performance prejudiced his defense in that it deprived him of a fair trial. Strickland v. Washington, 466 U.S. 668, 687 (1984). If the petitioner fails to demonstrate either one of these propositions, he fails to make out a case for habeas relief based on an allegation of ineffective assistance of counsel. In this case, Saunders has not shown defective performance on the part of attorney Finzel regarding the advice about testifying. This is fatal to his petition, and the Court need not reach the "prejudice" prong of the Strickland test.

11

## **Recommended Disposition**

That the Motion to Vacate, Set Aside or Correct Sentence be denied and the case be dismissed with prejudice.

*Lorenzo F. Garcia*

Lorenzo F. Garcia
Chief United States Magistrate Judge